IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| IN THE MATTER OF THE WELFARE OF: | ) ) ) ) | No. 32715-9-III |
| M.P. | ) ) ) ) | |
| | ) | UNPUBLISHED OPINION |

FEARING, J. — We address again the sad circumstances of the State of Washington terminating a parent's rights to a child. Jacqueline Pagel appeals the termination of her rights to the care and custody of her young son. We affirm the termination.

FACTS

Jacquelyn Pagel, born in 1971, experienced an unfortunate childhood, teenhood, and young adulthood. Pagel smoked cigarettes beginning at age nine, drank alcohol at eleven, inhaled marijuana at fifteen, snorted cocaine at twenty-five, and consumed methamphetamine at thirty. She engaged in theft and prostitution. She attempted suicide at age twelve. She now receives Social Security benefits for a learning disability,

posttraumatic stress, and anxiety. Pagel has lost her parental rights to six children, and another child has been under a guardianship since 2000.

Jacqueline Pagel suffers from bunions that cause chronic pain. Pagel refused to quit smoking long enough to undergo surgery for the bunions.

Jacquelyn Pagel bore Richard, on April 2, 2010. Richard is a fictitious name and, under the initials M.P., is the subject of this appeal. Pagel has not identified Richard's father. Based on Pagel's substance abuse and mental health illness, a court found Richard dependent in June 2010.

As part of Richard's first dependency, Psychologist Walter Mabee evaluated Jacquelyn Pagel in 2010. Dr. Mabee utilized the "Global Assessment of Functioning" (GAF) test, which measures an individual's functioning ability on a range from one to one hundred, with the higher number representing higher functioning. Mabee rated Pagel at sixty on the test. According to Walter Mabee, a score of sixty indicates "moderate impairments and moderate symptom severity and moderate limitations." Report of Proceedings (RP) at 45. Mabee did not disclose the types of skills measured when assessing one's functioning and what relationship the assessment bears to parenting.

Spokane therapist Carla Paullin visited with Jacquelyn Pagel three times per month during 2010. Paullin is a licensed mental health and chemical dependency counselor. During the period that Paullin assisted Pagel, Pagel engaged in the Family of Faith recovery program, which Paullin concluded temporarily changed and improved

2

Pagel's condition. Paullin testified at trial: "[Y]ou could see the difference in her. It brought her anxiety down, it helped her focus." RP at 75. At Paullin's recommendation, the State returned Richard to his mother's care, and a court dismissed the first dependency action in February 2012.

In late 2012, Jacquelyn Pagel commenced periodically deserting Richard with relatives because of her chronic pain. The Department of Social and Health Services (DSHS) received reports that Pagel deposited Richard with inappropriate caregivers and Pagel might be utilizing unlawful drugs again. Child Protective Services (CPS) employee Leah Furlong-Nicks investigated. In response, Pagel complained that her brother and sister wanted to kidnap Richard. She protested harassment by CPS and foster parents. Pagel agreed to provide a urine sample, but then failed to show to supply the sample. Furlong-Nicks lost contact with Pagel.

On January 16, 2013, the State of Washington petitioned the trial court to again declare Richard dependent of the State. The State alleged:

> Since dismissal of [Richard's] Dependency the Department has received reports that the mother has relapsed on drugs; has been seen prostituting; and has been leaving [Richard] with inappropriate people and leaving [Richard] with others for extended periods of time. On 9/2/12, [Jacquelyn Pagel] was arrested for shoplifting.

Ex. 1 at 2. The State identified in its petition Pagel's labile emotions, tangential speech, mental health illness, and chronic pain.

On January 18, 2013, Jacquelyn Pagel agreed to a shelter care order by which she

relinquished care and custody of Richard to DSHS. The order provided for her son's return to Pagel in one month if she completed a chemical dependency evaluation, provided four clean urine samples, and initiated mental health treatment with Carla Paullin.

In January 2013, a foster family assumed custody of Richard. Beginning January 2013, John Bain served as Richard's guardian ad litem (GAL) or court appointed special advocate (CASA). Bain completed his CASA training the previous month.

In January 2013, Jacquelyn Pagel reinitiated mental health counseling with Carla Paullin. Paullin then suspected Pagel of using illegal drugs because Pagel had lost significant weight and struggled with coherent thoughts and focused discussions. Paullin acted manic and spoke paranoically. Paullin concluded that losing seven other children traumatized Pagel. Paullin sought to help Pagel regulate her emotions.

Jacquelyn Pagel tested clean from any unlawful drug use on January 22 and 25, 2013. On February 12, 2013, John Dickey at New Horizons evaluated Pagel for chemical dependency. Pagel reported to Dickey that she last consumed drugs in 2009. Based on a lifetime of use, Dickey found Pagel chemically dependent on alcohol, cocaine, and cannabis, but deemed Pagel in remission. Pagel underwent no follow-up chemical dependency treatment with New Horizons. Dickey recommended continued therapy with Carla Paullin.

Jacquelyn Pagel tested clean from any drug use on February 13 and 14, 2013.

4

Nevertheless, Richard did not return to his mother's care within the anticipated month of shelter care. DSHS allowed Pagel to visit Richard in her home.

On April 2, 2013, Jacquelyn Pagel visited Richard, to celebrate his birthday, at Empowering, Inc., a family preservation services provider. Pagel brought Richard heaps of candy and multiple cakes. Pagel acted manic and under the influence of drugs. When Richard showed more interest in the candy than his birthday party, Pagel grew upset and agitated. Empowering, Inc. ended the visit early.

During spring 2013, CASA John Bain observed five of Jacquelyn Pagel and Richard's visits, some at Pagel's home and some at Empowering, Inc. During trial, Bain described the visits as chaotic. Pagel arrived late to every visit at Empowering. Once at Pagel's home, Pagel presented Richard a bike, but inexplicably quickly altered moods and directed Richard to brush his teeth. At trial, Bain testified:

> [W]hen I was there present at her visits, I felt like she just kept—like she kept like getting distracted by me. She wanted to see how I was doing. And, you know, I wasn't—I was there just to see how they interacted. I felt like I was just kind of in the way, because she had me and she had— someone from Empowering, Inc. would be like supervising it. And it was for, obviously, [Richard]. And so I felt like, you know, there was too many people in the room when I was there. She just couldn't concentrate on [Richard].

RP at 226-27.

John Bain observed Richard with his foster family five times. Bain found Richard happy at the foster home.

5

On April 4, 2013, the trial court once again declared Richard a dependent of the State. The trial court identified Jacquelyn Pagel's primary parental deficiency to be her mental health. The court found that Pagel lacked insight into her interactions with others and failed to demonstrate the concentration and focus needed to meet Richard's needs. The dependency order required Pagel to submit to random drug testing, complete a psychological evaluation with Dr. Walter Mabee, follow any recommendations of Mabee, continue individual therapy with Carla Paullin, obey any recommendations of Paullin, participate in family therapy and family preservation services, maintain regular visitation with Richard, demonstrate an ability to meet Richard's physical and psychological needs, maintain a clean, safe, and nurturing home environment, remain sober, and participate in a group relapse prevention program. Pagel tested clean from any drug use on April 23 and May 3, 2013.

On May 6, 2013, Dr. Walter Mabee reevaluated Jacquelyn Pagel. Pagel showed the psychologist the bunions on her feet and left the evaluation early to retrieve medication. Pagel returned the next day, at which time Mabee completed the psychological evaluation. Dr. Mabee believed Pagel to exaggerate her complaints of physical pain. Mabee opined that Pagel focused on her physical pain to the extent that the focus interfered in her parenting.

Dr. Walter Mabee opined that Jacquelyn Pagel used avoidance to cope with stress. Pagel refused to answer Mabee's questions about handling stressful situations with

6

Richard. Pagel did not concede any parenting weaknesses. She boasted that her devotion to God rendered her a "good and awesome parent." RP at 45. Dr. Mabee noted that a parent who avoids her deficiencies leads to a child who cannot adjust to his environment.

Dr. Walter Mabee diagnosed Jacquelyn Pagel with "Cluster B features" under the psychologists' Diagnostic and Statistical Manual. RP at 42-43. Dr. Mabee explained Cluster B features as:

> the excessive emotionality that she has in her presentation of her symptoms and presentation of her life situation; a tendency to go from being calm to being kind of more activated and agitated; a tendency to feel that others are not treating her in the way that she should be treated and an entitlement issue. So it's those types of observations, along with her reports that she's always had difficulty coping with anger, being able to control her anger, that it boils down to not a specific Axis II diagnosis, like a borderline diagnosis or an antisocial diagnosis or histrionic diagnosis or narcissistic, but it's a flavor of those types of symptoms in combination. So the label of "Cluster B" just kind of subsumes all of that rather than specific diagnosis.

RP at 43-44.

In his 2013 evaluation, Walter Mabee reassessed Jacquelyn Pagel at forty-five on the Global Assessment of Functioning scale. Dr. Mabee testified at trial that this score confirms significant mental health issues that interfere with social and occupational functioning.

Jacquelyn Pagel's urinalysis was negative on May 7, 2013.

On May 10, 2013, Jacquelyn Pagel took Richard to a physician because Richard purportedly complained about a painful penis. Pagel asked the physician to circumcise

Richard. Richard did not report any pain to the doctor, and the physician did not diagnose any ailment. After this incident, the trial court granted DSHS' motion to modify visitation from unsupervised to supervised visits and to limit visitation locations to Empowering.

Jacquelyn Pagel tested clean from drug use on May 13, 2013.

Ensuing visits between mother and son under the supervision of Empowering did not go well. Jacquelyn Pagel did not focus on Richard's needs. At one session, Pagel fell asleep while encouraging Richard to nap with her. Richard routinely returned to his foster home hungry. Pagel's attendance at visitation became sporadic, with Richard crying and hitting his foster siblings when his mother failed to show for a visit. Empowering eventually refused to transport Richard from foster care until Pagel appeared for a visit.

Jacquelyn Pagel missed some family therapy sessions. When a counselor addressed Pagel's parenting of Richard, Pagel diverted the discussion to criticism of CPS and Richard's foster family.

On May 20, 2013, the trial court held the first review hearing for Richard's dependency. The court found that Jacquelyn Pagel had participated in some, but not all, court ordered services. Pagel failed to provide urine samples on April 2, 8, and 10. Pagel failed to progress in family preservation services, such that the service provider discontinued services. The court also found that Pagel had not consistently attended

therapy with Carla Paullin. Pagel provided no proof of her participation in the required group relapse prevention program. The trial court ordered a swift completion of a parenting assessment.

In July 2013, Jacquelyn Pagel saw Carla Paullin for the last time. In late July 2013, Pagel visited Richard at Empowering and took Richard to a nearby restaurant. During the walk to the restaurant, Richard ran into traffic without intervention from Pagel. In the restaurant's lobby, Richard sat in a chair while Pagel bent over and scolded him for unsuccessful visits. An Empowering employee intervened, separated Richard from Pagel, and demanded Pagel leave.

In September 2013, Jacquelyn Pagel became homeless. Ostensibly, Pagel's landlord evicted her, although Pagel denied any eviction. DSHS could only sporadically contact Pagel thereafter.

## PROCEDURE

On September 13, 2013, the State of Washington petitioned the trial court to terminate the parent-child relationship between Jacquelyn Pagel and Richard.

On October 1, 2013, the trial court reduced Jacquelyn Pagel's visitation with Richard to two hours twice a week and ordered this visitation to include two hours of therapeutic visitation. On October 15, 2013, the trial court held a permanency planning hearing for Richard. The court found that Jacquelyn Pagel visited Richard only sporadically. Pagel excused her missing visits on illness and the lack of a telephone. In

9

an October 15 order, the trial court listed as the services unsuccessfully completed: chemical dependency screening, recommended substance abuse evaluation and treatment, random drug testing, psychological evaluation, following any psychological evaluation recommendations, and family therapy. Notably absent from this list of uncompleted services was the originally ordered group relapse prevention program. Nevertheless, Pagel still had not participated in a relapse prevention program.

In January 2014, DSHS social worker Shana Piper assumed case worker duties for Richard's care. Jacquelyn Pagel then resided in jail. After Pagel left jail, Piper arranged for Pagel to visit Richard at a new location, Fulcrum. At Fulcrum, Pagel focused on punishing Richard for unknown reasons, while Richard ignored his mother.

On February 4, 2014, the trial court held another dependency review hearing. During the review period, Jacquelyn Pagel submitted to no drug testing. The court found Pagel noncompliant with her mental health treatment and relapse prevention program. Like the October 2013 review order, the February review order lists all services as incomplete, but omits group relapse prevention from the list.

In March or April 2014, Jacquelyn Pagel phoned therapist Carla Paullin. Paullin attempted to return Pagel's call, but Pagel's phone was disconnected. In April 2014, at Jacquelyn Pagel's request, Shana Piper switched visitation from Fulcrum to the American Indian Center. At trial, Shana Piper explained that if a parent misses three scheduled visits at a visitation center, the DSHS referral to that center lapses. Pagel repeatedly

missed visits, so Piper repeatedly issued new referrals to additional visitation centers.

At the start of May 2014, Jaqueline Pagel lost her social security income because of her recent jailing. Pagel remained homeless.

Trial on the termination petition proceeded on May 8 and 9, 2014. At the beginning of trial, Jaqueline Pagel's counsel moved to continue trial to a later date, because Pagel was missing. The trial court phoned Pagel, who expressed a desire to enter treatment. The trial court gave Pagel until 10:00 a.m. that morning to come to the courthouse. Pagel refused defense counsel's offer to arrange transportation. Trial started without her.

During trial, Carla Paullin testified that Jacquelyn Pagel's mental health illness prevented her from prioritizing a child's needs. Paullin testified that medication might permit Pagel to attend to a child's needs, but Pagel refused medication. Paullin believed that Pagel suffered physical pain, but thought Pagel exaggerated the pain. According to Paullin, Pagel failed to participate in mental health therapy during the second dependency.

Psychologist Walter Mabee also testified during trial. Dr. Mabee opined that, even if Pagel fully engaged in mental health treatment, she would not improve significantly within the first three to six months of treatment. According to Dr. Mabee, Pagel needed nine to twelve months at least, and more likely two to four years, to improve her mental health.

DSHS social worker Wendy Seignemartin testified. Seignemartin was the first caseworker assigned to Richard's case. Seignemartin identified Jacquelyn Pagel's parental deficiencies as her mental health illness and chemical dependency. As a result of these deficiencies, Pagel could not consistently meet Richard's needs. Wendy Seignemartin described Richard as integrated into his foster family, who wished to adopt him. Seignemartin testified that continuing Pagel and Richard's parent-child relationship diminished Richard's ability to integrate into a permanent home. According to Seignemartin, termination of his natural mother's parental rights served Richard's best interest.

Wendy Seignemartin testified at trial that someone referred Jaqueline Pagel to Alcohol Anonymous and Narcotics Anonymous, and Carla Paullin referred Pagel to New Horizons Relapse Prevention Program. The trial court asked Seignemartin: "How does she know where to go?" RP at 136. Seignemartin responded inartfully:

> Well, and that was something that was—she—her therapist had recommended. So I—I would say I—I did not provide that one specifically.

RP at 136. Seignemartin added that Pagel needed to access such a program "through her medical." RP at 136. One might deduce from this comment that DSHS expected Pagel to arrange and pay for services through medical insurance. Seignemartin, however, declared that Pagel reported attending a relapse prevention program named Celebrate Recovery.

12

CASA John Bain testified at trial that termination of the mother's rights furthered Richard's best interests. Bain maintained that Jacquelyn Pagel garnered a weak relationship with Richard and Pagel had no ability to calm Richard. In contrast, Bain described the foster parents as providing a loving home with good structure. Bain noted that the foster parents sought adoption of Richard.

One year had passed between John Bain's last observations of Jaqueline Pagel with Richard by the time of Bain's trial testimony. During trial, Bain admitted to ceasing observation of Pagel's visit because he was uncomfortable during the visits. Bain did not know that DSHS shifted visitation from Empowering to Fulcrum. John Bain testified: "I must have—I must have missed that e[-]mail, I guess." RP at 228. Bain also testified he was unaware that visitation transferred from Fulcrum to American Indian Center. Bain stated he also missed that e-mail.

The trial court ordered the termination of Jaqueline Pagel's parental rights to Richard. On July 25, 2014, the trial court entered findings of facts, conclusions of law, and the order of termination. On August 21, a superior court commissioner amended the findings, conclusions, and order to clearly terminate any parental interest. The amended findings include:

> Services court-ordered under RCW 13.34.130 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting parental deficiencies within the foreseeable future have been offered or provided.
> . . . .

13

> There is little likelihood that conditions will be remedied so that the child can be returned to the parent(s) in the near future.
>
> . . . .
>
> [Pagel] is currently unfit to parent [Richard]. [Pagel's] mental health is not stable, she is homeless, likely using drugs and unable to physically or emotionally protect her son. She has been largely unengaged in services and visitation since the summer of 2013.
>
> . . . .
>
> It is in the child's best interests to terminate the parent-child relationship.

Clerk's Papers at 85-89.

## LAW AND ANALYSIS

The State must prove many elements before terminating a parent's constitutional rights to the care and custody of a child. Jacquelyn Pagel contends insufficient evidence supported some of those elements and the trial court's findings that the State proved the elements. Pagel contends that the trial court erred when finding that: (1) the State provided her all necessary and reasonably available services, (2) her parental deficiencies were unlikely to be remedied in Richard's near future, and (3) termination was in Richard's best interests. Pagel also contends that John Bain, the CASA, so failed to conduct a thorough and independent investigation that the failure violated her and Richard's right to due process. We disagree with each contention.

Termination of parental rights is a two-step process. *In re Welfare of C.B.*, 134 Wn. App. 942, 952, 143 P.3d 846 (2006). First, the State must show that six statutory requirements under RCW 13.34.180(1) are established by clear, cogent, and convincing

14

evidence. RCW 13.34.190(1)(a)(i). This means the State must show that the relevant ultimate facts in issue are "highly probable." *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995); *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). Second, the State must show a termination order serves the best interests of the child. RCW 13.34.190(1)(b). The trial court must find by a preponderance of the evidence that termination is in the best interests of the child. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

Jacquelyn Pagel challenges some the trial court's factual findings that underlay its termination of her parental rights. The trial court's factual findings under the first step, for RCW 13.34.180(1), must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent and convincing evidence. *In re Dependency of C.B.*, 61 Wn. App. 280, 286, 810 P.2d 518 (1991). Likewise, the trial court's factual findings under the second step, RCW 13.34.190(1)(b), must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by a preponderance. *In re Dependency of H.W.*, 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998). Because only the trial court has the opportunity to hear the testimony and observe the witnesses, its decision is entitled to deference and this court will not judge the credibility of the witnesses or reweigh the evidence. *In re Welfare of M.R.H.*, 145 Wn. App. at 24.

Provision of Services

15

Under one of the six statutory requirements, the State must establish that it provided services to Jacqueline Pagel to correct deficient parenting skills. When DSHS seeks to terminate a parent's rights, it must show by clear, cogent, and convincing evidence:

> That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

RCW 13.34.180(1)(d). RCW 13.34.136 further addresses services to the parent and reads, in pertinent part:

> . . . .
> (2) The agency supervising the dependency shall submit a written permanency plan to all parties and the court not less than fourteen days prior to the scheduled hearing. . . .
> . . . .
> (b)(i) The . . . supervising agency's plan shall specify what services the parents will be offered to enable them to resume custody, what requirements the parents must meet to resume custody, and a time limit for each service plan and parental requirement.
> . . . .
> (b)(vii) The supervising agency or department shall provide all reasonable services that are available within the department or supervising agency, or within the community, or those services which the department has existing contracts to purchase. It shall report to the court if it is unable to provide such services.

To meet its statutory burden, the State must tailor the services it offers to meet each individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). The State must provide all court-ordered and necessary services to the

16

parent. *In re Dependency of D.A.*, 124 Wn. App. 644, 651, 102 P.3d 847 (2004). Nevertheless, the court may consider any service received, from whatever source, bearing on the potential correction of parental deficiencies regardless of whether the State provides or arranges for the service. *In re Dependency of D.A.*, 124 Wn. App. at 651-52. The State need not offer services when a parent is unable to benefit from the services. *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Even when the State inexcusably fails to offer a service to a willing parent, termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future. *In re Welfare of S.J.*, 162 Wn. App. at 881.

Jacquelyn Pagel contends insufficient evidence supports the trial court's findings that the State supplied all necessary and reasonably available services. Pagel identifies five services the State failed to deliver: a relapse prevention program, a parenting evaluation, a medication consultation, medical care for her bunions, and housing assistance. We agree that the State failed to provide the five categories of services, but note that the evidence showed that Pagel received one service elsewhere, the State could not provide some of the services because of Pagel's failure to cooperate, and the services would not have remedied Pagel's parental deficiencies.

The undisputed evidence established that the State failed to offer a group relapse prevention program to Jacquelyn Pagel. DSHS caseworker Wendy Seignemartin testified she did not refer Pagel to a relapse prevention program because of the absence of a

contract for such a service. Nevertheless, Seignemartin never informed the court of the unavailability of this program as RCW 13.34.136 requires. Furthermore, Seignemartin indicated Pagel needed to access such a program "through her medical." RP at 136. Seignemartin delivered no testimony that she informed Pagel that Pagel needed to arrange this service for herself. Nevertheless, despite DSHS' failure to offer the program, Jacquelyn Pagel reported that she attended a relapse prevention program named Celebrate Recovery. The provision of the service by another entity supports the trial court's finding that Pagel received needed services.

As part of the dependency action, the trial court ordered a parenting evaluation, but the State failed to offer Jacqueline Pagel such an evaluation. The State argues that the court's ordering of this service was a scrivener's error. An early order listed the service but no later order repeated the need for an evaluation. We disagree with the State's argument, but do not reverse on this ground. The trial court ordered the evaluation in May 2013. Thereafter Pagel disengaged from services. An evaluation would not have corrected the parental deficiencies.

The trial court never ordered a medication consultation and one might question the reasonableness and necessity for a consultation. Carla Paullin testified that Pagel refused to take medication for her mental health issues, suggesting that a medication consultation would have been pointless. Pagel reported chronic pain from bunions to most providers. Each believed Pagel exaggerated her pain, a symptom of her poor mental health. Pagel

refused to quit smoking long enough to get surgery for the bunions.

The trial court never ordered housing assistance. Nevertheless, Pagel

halfheartedly and inconsistently participated in services when she had adequate housing.

By the time Pagel needed housing assistance in September 2013, Pagel had stopped

attending mental health therapy.

Timely Remedy of Parental Deficiencies

Jacquelyn Pagel next contends insufficient evidence supports the trial court's

findings that Pagel's parental deficiencies were unlikely to be remedied in Richard's near

future. Under RCW 13.34.180(1)(e), DSHS must show:

> That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. In determining whether the conditions will be remedied the court may consider, but is not limited to, the following factors:
> (i) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documented multiple failed treatment attempts;
> (ii) *Psychological incapacity or mental deficiency* of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or

> documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future; or
>
> (iii) Failure of the parent to have contact with the child for an extended period of time after the filing of the dependency petition if the parent was provided an opportunity to have a relationship with the child by the department or the court and received documented notice of the potential consequences of this failure, except that the actual inability of a parent to have visitation with the child including, but not limited to, mitigating circumstances such as a parent's current or prior incarceration or service in the military does not in and of itself constitute failure to have contact with the child.

(Emphasis added.)

The "near future" is a key term in RCW 13.34.180(1)(e). The parental deficiencies must be remedied such that the child may be returned to the parent in the "near future." "Near future" is determined from the child's point of view. *In re Dependency of A.C.*, 123 Wn. App. 244, 249, 98 P.3d 89 (2004). What constitutes "near future" depends on the age of the child and the circumstances of the child's placement. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 205, 108 P.3d 156 (2005).

Washington cases support the proposition that the younger the child the shorter is the "near future." A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency. *In re Welfare of M.R.H.*, 145 Wn. App. at 28 (2008). Eight months was not in the foreseeable future of a four-year-old. *In re Welfare of Hall*, 99 Wn.2d 842, 844, 664 P.2d 1245 (1983). One year was not in the foreseeable future of a three year-old. *In re A.W.*, 53 Wn. App. 22, 31-32, 765 P.2d 307 (1988). Six months was not foreseeable in

20

the near future of a 15 month-old. *In re Dependency of P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159 (1990).

The focus of RCW 13.34.180(1)(e) is "whether the identified deficiencies have been corrected." *M.R.H.*, 145 Wn. App. at 27. Even when there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate when deficiencies will not be corrected within the foreseeable future. *In re Dependency of A.W.*, 53 Wn. App. at 32. The State need not give a parent an unlimited time to become a fit parent. *In re Dependency of T.R.*, 108 Wn. App. at 167 (2001). When it is eventually possible, but not imminent, for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination. *T.R.*, 108 Wn. App. at 166.

The State argues that the one year rebuttable presumption in RCW 13.34.180(1)(e) applies to Jacqueline Pagel's proceedings. The presumption only arises if the State showed it offered all necessary services reasonably capable of correcting Jacquelyn Pagel's parental deficiencies. Because the State did not offer all services even ordered by the trial court, we decline to employ the presumption.

We need not apply the presumption of RCW 13.34.180(1)(e) to affirm the trial court since clear, cogent, and convincing evidence supports the trial court's finding that Jacqueline Pagel would not cure her parental deficiencies in Richard's near future. Pagel challenges the trial court's finding by highlighting contradictory evidence, not undisputed

21

evidence. Pagel underscores that Wendy Seignemartin estimated Richard's near future at six to twelve months, while Dr. Walter Mabee testified that Pagel's mental health could improve within nine months, if Pagel complied with necessary services. Nevertheless, Dr. Mabee also testified that Pagel would need two to four years for fuller stabilization. This court does not reweigh the evidence, and the trial court could have accepted the longer period as the time needed for Pagel to cure her deficiencies.

Jacqueline Pagel's argument predominantly fails because the contention assumes she would comply with services in the near or immediate future. The weight of evidence indicates that Pagel would not cooperate with service providers and suffer needed services for the ensuing nine to twelve months. By the date of trial, Pagel had refused to visit Carla Paullin, her mental health therapist, for one year. Unlike the first dependency, Pagel failed to consistently participate in mental health therapy. Pagel repeatedly failed to show for visits with Richard. DSHS caseworkers encountered increasing difficulty in contacting Pagel.

A parent's unwillingness to avail herself of remedial services within a reasonable period bears relevance to a trial court's determination as to whether the State has satisfied RCW 13.34.180(1)(e). *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). Substantial evidence supports our trial court's finding.

### Richard's Best Interests

The second step in the State's burden in a parental termination case involves

proving by a preponderance of evidence that termination is in the child's best interest.

RCW 13.34.190(1)(b). As noted in *In re Welfare of A.B.*:

> By virtue of RCW 13.34.180(1) and RCW 13.34.190, a Washington court uses a two-step process when deciding whether to terminate the right of a parent to relate to his or her natural child. The first step focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence. The second step focuses on the child's best interests and need be proved by only a preponderance of the evidence. Only if the first step is satisfied may the court reach the second.

168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnotes omitted). No specific factors are involved in a best interest determination, and each case must be decided on its own facts and circumstances. *In re Welfare of M.R.H.*, 145 Wn. App. at 28 (2008). When a parent has failed to remedy her parental deficiencies over a lengthy dependency, a court is justified in finding termination is in the child's best interest rather than leaving the child in the limbo of foster care for an indefinite period while the parent seeks to rehabilitate herself. *In re Dependency of T.R.*, 108 Wn. App. at 167 (2001).

Jacquelyn Pagel contends insufficient evidence supports the trial court's findings that termination was in Richard's best interests. She highlights the love and bond she and Richard shared. The trial court recognized that Pagel loves her child. Despite that love, substantial evidence supports the trial court's finding that termination was in Richard's best interests. Dr. Walter Mabee diagnosed Pagel with serious, significant mental health impediments that interfere with social and occupational functioning. Pagel presented as suspicious and unstable. Pagel took Richard to a physician and requested an unnecessary

circumcision. Carla Paullin testified that Pagel's various mental health issues prevent her from prioritizing a child's needs. Wendy Seignemartin believed termination to be in Richard's best interest, so he could achieve permanence with adopting parents. Richard lived happily and integrated with his foster home.

## CASA Investigation

Jacquelyn Pagel contends that John Bain, Richard's guardian ad litem or CASA, neglected to conduct a thorough and independent investigation and his failure violated her and Richard's right to due process. The terms CASA and guardian ad litem are synonymous in this context, and we will employ the term CASA.

Both the United States and Washington Constitutions recognize a parent's fundamental liberty interest in the care and custody of her child. U.S. CONST. amends. V, XIV; WASH. CONST. art. I, § 3; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Custody of Smith*, 137 Wn.2d 1, 13-14, 969 P.2d 21 (1998). That right cannot be abridged without due process of law. U.S. CONST. amend. XIV; *In re Dependency of A.M.M.*, 182 Wn. App. 776, 790-91, 332 P.3d 500 (2014). Accordingly, parental termination proceedings are afforded strict due process protections. *In re Darrow*, 32 Wn. App. 803, 806, 649 P.2d 858 (1982).

Due process requires that parents have notice, an opportunity to be heard, and the right to be represented by counsel. *In re Welfare of Key*, 119 Wn.2d 600, 611, 836 P.2d 200 (1992); *In re Welfare of Myricks*, 85 Wn.2d 252, 254, 533 P.2d 841 (1975). More

specifically, the due process protections afforded parents in a termination hearing include notice, open testimony, time to prepare and respond to charges, and a meaningful hearing before a competent tribunal in an orderly proceeding. *In re Dependency of H.W.*, 70 Wn. App. 552, 555 n.1, 854 P.2d 1100 (1993); *In re Moseley*, 34 Wn. App. 179, 184, 660 P.2d 315 (1983). The trial court must ensure that the parent is afforded a full and fair opportunity to present evidence or rebut evidence presented against her. *A.M.M.*, 182 Wn. App. at 791. No decision imposes a requirement of a CASA in order to satisfy the due process clause, let alone any minimum standard for a CASA's investigation.

Under RCW 13.34.100(1): "The court shall appoint a guardian ad litem for a child who is the subject of an action under this chapter, unless a court for good cause finds the appointment unnecessary." "If a party reasonably believes that the appointed guardian ad litem lacks the necessary expertise for the proceeding," within three days of the appointment, the party may move for substitution of the appointed CASA. RCW 13.34.102(2)(c). Jacqueline Pagel did not seek to remove John Bain.

A CASA assumes an important role in a parental termination case.

> Judges are forced to make incredibly difficult and important determinations. The judge must rely upon the information provided by others. GALs and volunteer CASAs are invaluable to courts. They are often the eyes and ears of the court and provide critical information about the child and the child's circumstances.

*In re Dependency of M.S.R.*, 174 Wn.2d 1, 20-21, 271 P.3d 234 (2012). Unless a court directs otherwise, a CASA holds the duties:

25

(a) To investigate, collect relevant information about the child's situation, and report to the court factual information regarding the best interests of the child;

(b) To meet with, interview, or observe the child, depending on the child's age and developmental status, and report to the court any views or positions expressed by the child on issues pending before the court;

(c) To monitor all court orders for compliance and to bring to the court's attention any change in circumstances that may require a modification of the court's order;

(d) To report to the court information on the legal status of a child's membership in any Indian tribe or band;

(e) Court-appointed special advocates and guardians ad litem may make recommendations based upon an independent investigation regarding the best interests of the child, which the court may consider and weigh in conjunction with the recommendations of all of the parties;

(f) To represent and be an advocate for the best interests of the child[.]

RCW 13.34.105(1); *see also* GALR 3.

A CASA is not the child's lawyer. *MSR*, 174 Wn.2d at 21. For purposes of fulfilling his or her duties, the CASA shall be deemed an officer of the court and thus immune from civil liability. RCW 13.34.105(2); *Kelley v. Pierce County.*, 179 Wn. App. 566, 576, 319 P.3d 74, *review denied*, 180 Wn.2d 1019, 327 P.3d 55 (2014).

Jacquelyn Pagel forwards a procedural due process claim. A familiar test of procedural due process arises from *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), in which the Supreme Court directed lower courts to weigh the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions, when assessing infringement of a party's procedural due

26

process. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981).

Pagel does not contend that RCW 13.34.100 and .105 are constitutionally deficient. Rather, Pagel contends that John Bain denied Richard and her the process that chapter 13.34 RCW affords. More specifically, Pagel argues that Bain failed in his statutory duties by focusing on Richard's relationship with his foster family. Bain had not seen Richard with Pagel for one year when he testified at trial. Thus, Pagel maintains Bain could not gauge Richard's best interests. Pagel asks this court to apply the *Mathews* factors and hold that the procedure Richard and she received did not pass constitutional muster.

The State observes that Jacqueline Pagel did not complain about John Bain's performance at the trial court level. The State argues that Jacquelyn Pagel cannot raise this argument for the first time on appeal. We agree.

RAP 2.5(a) provides, in relevant part: "The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court . . . (3) manifest error affecting a constitutional right." Washington courts have announced differing formulations for "manifest error." One articulation is that the error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988). Another test is whether the alleged error actually affected the defendant's rights. A

27

showing of actual prejudice makes the error "manifest," allowing appellate review. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). The focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review. *State v. O'Hara*, 167 Wn.2d at 99-100.

We decline to address Jacqueline Pagel's assignment of error of a neglectful investigation by the CASA. Pagel did not object to John Bain's initial appointment under RCW 13.34.102(2)(c). Pagel did challenge the foundation of Bain's testimony or his conclusions. Pagel had a full opportunity to cross-examine Bain in open court and, in doing so, defense counsel thoroughly exposed the potential weaknesses in his testimony. Even ignoring Bain's testimony, substantial evidence supports the trial court's finding that termination was in Richard's best interests. Pagel does not enlighten the court as to what helpful information the CASA may have unearthed if he engaged in a thorougher investigation. Pagel forwards no decision that holds a neglected investigation by a CASA constitutes a due process violation.

A case of some relevance is *In re Welfare of T.B.*, 150 Wn. App. 599, 209 P.3d 497 (2009). In *T.B.*, the CASA met with one child twice, the second child once, relative placements six to eleven times, and the mother whose rights were at issue once. *T.B.*, 150 Wn. App. at 615. The CASA did not communicate with the children during the year preceding the termination trial. The CASA explained that he had not observed the children recently because they appeared stable in their placements. Over objection, the

28

trial court allowed the CASA to testify to the children's best interests, but indicated it

would later decide the weight to afford the CASA's recommendations.

The mother in *T.B.* argued on appeal that the CASA's investigation breached the

statutory requirements imposed on an advocate. We held:

> The trial court indicated that under former RCW 13.34.105, it would take into account the extent of the GAL's investigation in deciding what weight to give the GAL's recommendation. We hold that the trial court appropriately considered the GAL's recommendation. Even if we determined that the trial court erred, such error would be harmless because there is no reason to believe that the trial court's decision would have differed without the GAL's recommendation. . . .
>
> Certain cases establish the standard that a GAL must satisfy to justify a finding. This is a case that sets the minimal standards for a GAL investigation under the version of former RCW 13.34.105 in effect at the time of this termination hearing. As we have noted, it would not be adequate under the new requirements, but we have examined the record and are satisfied that an investigation took place. We agree with the State that it was "not the most thorough investigation possible." Br. of Resp't at 26. We hold that the court did not err in considering the GAL's recommendation and giving it the appropriate weight considering the lack of current personal contact with the children.

*T.B.*, 150 Wn. App. at 615-16.

## CONCLUSION

We affirm the trial court's termination of Jacqueline Pagel's parental rights to

Richard.

A majority of the panel has determined this opinion will not be printed in the

No. 32715-9-III
*In re the Welfare of M.P.*

Washington Appellate Reports, but it will be filed for public record pursuant to RCW
2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.

30